[Crim. No. 3875.   In Bank.—February 18, 1936.]

THE PEOPLE, Respondent, v. J. C. BOULTON, Appellant.

No appearance for Appellant.

U. S. Webb, Attorney-General, and Ralph H. Cowing, Deputy Attorney-General, for Respondent.

SEAWELL, J.—The defendant, by an information filed against him in the Superior Court of the County of Butte, was charged with and convicted of the crime of murder of the first degree, committed by him in said county on October 20, 1934. The murder consisted of the stabbing, on October 20, 1934, of A. D. Miner, a peace officer of the city of Gridley, county of Butte, who died four days later as the direct result of said knife wound inflicted by the defendant with homicidal intent. The jury did not by its verdict relieve the defendant of the extreme penalty of the law, and the court thereupon imposed the extreme penalty as it is required to do in cases where the jury refuses to exercise its discretion by relieving the defendant of the death penalty.

In addition to his plea of not guilty of the offense charged, he also entered a plea of not guilty of the offense charged because he was insane at the time it was alleged that he committed the crime. The jury found against the accused on both issues.

In due course the defendant moved for a new trial. The motion was denied and the death penalty was accordingly pronounced. Notice of appeal from the judgment of conviction was duly given by the attorney who conducted the defenses of not guilty of the offense charged and not guilty by reason of insanity. He took no steps to prosecute the appeal, which comes to us automatically, and we have before us the clerk's and the reporter's transcripts on appeal, but no briefs from either side. Nevertheless we have read the entire transcript of testimony, the clerk's transcript, including the court's instructions, and all papers constituting the record.

The facts of the homicide are briefly told. The defendant arrived in Gridley on the morning of October 20, 1934. He had lived a roving life. According to his own words he abandoned the occupation of his early manhood, that of carpenter, and for twelve years had made a livelihood beating the "punch board", which is a device as common in cigar stores and shop places as the slot machine. Shortly after eating his breakfast he met a wayfarer, and they fraternized during the day. He explained to the wayfarer, whom he referred to as

a lumberjack, how he could beat the punch board. Taking his instructions, the lumberjack proceeded to a cigar store and by following the defendant's instructions won three cartons of cigarettes. The defendant purchased them for the sum of two dollars and peddled them in packages to whomsoever would buy. He was called to account for his action and taken to the city hall by a peace officer, where he was questioned. He explained how he came into possession of the cigarettes and was released by the officer. The defendant's destination was Marysville. It seems that no transportation was available to his destination until late in the afternoon. He and his companion made the public park which adjoins the Southern Pacific Company's depot their stopping place. Early in the afternoon, as they were seated on a bench, a boy of about ten years of age and his playmates came into the park and began to play in boyish fashion. The defendant engaged them in conversation and entered into the sport with the boys. The caretaker of the park, Joe Lopez, heard some suggestive words directed to the boy by the defendant which caused him to become suspicious of his real purposes. His first contact with the defendant had been some hours before, when the defendant offered to sell him a package of cigarettes and inquired as to the time the first conveyance left for Marysville. Lopez finally saw the defendant exhibit a piece of money to the boy and heard him ask if he would like to have the money. The boy went with him into the public toilet. Lopez heard the boy saying "No, no," soon after entering the toilet, and Lopez immediately reported the matter to Mr. Lalla, who 'phoned to the police headquarters, and Mr. A. D. Miner, a deputy sheriff and peace officer of Gridley, accompanied by Mr. Toney Soares, arrived upon the scene a very few minutes after the defendant and the boy entered the toilet. Mr. Miner grabbed the door knob, shook and beat against the door, and commanded the defendant to open it. The defendant first said "No," and then immediately thereafter replied "Wait a minute," and gave a plausible reason for his presence in the toilet. Both the boy and defendant came out upon the order of Mr. Miner and the defendant was seen buttoning up his trousers as he left the toilet. The boy was taken aside by the officer and upon being questioned said the man had offered him a dollar to be a party to an

immoral act made punishable as a felony by statute. He said the defendant exposed his person to him, and he related to the officer the details of the act the defendant was attempting to accomplish. He told a damaging and convincing story against the defendant. The officer then accosted the defendant and told him to come with him, as he was under arrest. The defendant made some attempted explanation of the situation, but the officer said to him that he "didn't have to explain anything to him, he knew". The officer took him by one arm and Mr. Soares took him by the other and they walked him to the officers' automobile, which was parked in front of the Gridley Hotel. The defendant was placed on the back seat and Mr. Soares took a seat by his side. The boy sat by the side of Mr. Miner, who was at the wheel. The car was started and had not progressed but a few feet when the defendant, to the surprise of Soares, struck him a heavy blow in the stomach, saying, "Take that." He held a knife gripped in his hand, and the blade entered Soares' abdomen. Soares was temporarily stunned and disabled by the blow and knife thrusts. The defendant, who was then upon his feet, reached forward and threw his left arm around Mr. Miner's neck and struck him a terrific blow with the open knife, the blade of which entered about one-half inch below the right nipple, cutting a wound five inches in length and extending into the chest cavity. The defendant was finally overpowered by bystanders and the knife fell from his hand to the pavement. Blood gushed in a stream from the gaping wound. A physician was summoned at once, but it was quite impossible to completely staunch the flow of blood. Specialists from San Francisco and physicians from Gridley and near-by cities were called on the case, but it seemed from the first that the wound was mortal and Mr. Miner died from the immediate effects of the wound on the fourth day thereafter. He grew progressively weaker from the first. That the knife thrust was the immediate cause of death is not even a debatable question.

Upon being questioned a little while after the cutting as to why he had cut Mr. Miner, defendant replied, "I don't give a damn. I will cut your guts out too." Afterwards he told Deputy Sheriff Heimburger that he cut the men "be-

cause they tried to arrest him without any reason and that he would do it again''.

After Mr. Miner had been cut, Constable Elliott undertook to remove him from the Gridley city prison to the county jail at Oroville. Deputy Sheriff Frazier was to accompany him. The defendant was handcuffed and seated on the front seat with Mr. Elliott. Mr. Frazier was seated on the rear seat. Before they had left the city limits Mr. Elliott called to Mr. Frazier that the defendant had thrust a knife blade into his side and was bearing down on the knife handle. Mr. Frazier had a pistol on the seat and he struck the defendant five or six times on the head and he finally loosed his hold on the knife. Mr. Frazier's finger was also cut in the struggle. While Mr. Elliott and Mr. Frazier were engaged in the struggle to subdue the defendant the automobile, being out of control, ''side-swiped'' two other cars, ending up in a crippled condition. Another was pressed into service and the defendant was delivered to the sheriff at Oroville.

The evidence as to the homicide is without contradiction. Several eye-witnesses testified in the case. There is no substantial evidence in the record which would justify a finding that the defendant was suffering from settled insanity. An examination of his testimony will show that he is a man of at least, if not above, average intelligence. He seemed quite mentally alert, exhibited powers of discernment and reasoned logically. His attempt to show congenital insanity was not impressive. He knew nothing personally of any mental disturbance existing in either branch of his parents' families, but testified that he understood that his father was afflicted with senile dementia and his mother had suffered mental disturbances during her menopause state, neither of which conditions, if proved satisfactorily, would necessarily indicate inherited insanity. He also testified that his uncle had killed his own father and had been adjudged insane. He also stated that at one period in his life he felt that he was ''seeing things'' and he surrendered himself to an institution for the care of the insane, but that he was soon released and has not since experienced any mental disturbances. His testimony on the issue of congenital insanity is very weak, as nothing of substance was proved by positive or convincing evidence. Two physicians were called to testify as to the

sanity of the defendant, one being a psychiatrist and superintendent of the Agnew State Hospital for the insane and the other a physician selected by the court. Both experts, upon thorough physical and mental examinations and tests made by them, gave it as their opinion that the defendant was sane at the time he struck the fatal blow. The superintendent of the Agnew State Hospital testified that the defendant manifested no symptoms whatsoever that would indicate that he was or had been at any time insane.

The theory of the defense was twofold. First, that the mind of the defendant had been affected by intoxicating liquor which he had drunk at mid-day at Gridley to the extent that he was not conscious of the act he had committed, and second, if he was conscious as to what he was doing, he believed the officers, who were not in uniform, were not in fact officers and he believed that he had a right to resist being forcibly thrust into the automobile.

We will first briefly consider the temporary unconscious period into which the defendant claims he lapsed. His testimony is that he was not addicted to the habitual use of intoxicating liquors. He contends that an hour or two after arriving in Gridley, he drank a few glasses of beer and thereafter, and while in the public park in company with his companion, at least two pints of whisky were consumed by the two. He claims that the liquor was purchased by his companion with the money which he received from the sale of the cigarettes. The only evidence as to intoxication comes from the defendant. There is, however, testimony given by one witness to the effect that the defendant and his companion were seen to withdraw from the bench which they were occupying and become lost to sight among box cars in the switching yards. The defendant claims that he partook freely of the liquor so furnished. Five or six persons, including several peace officers, testified that they were in close contact with the defendant for a considerable time after he was in custody and they did not detect the odor of liquor on his breath. They also testified that his movements did not indicate that he was affected with intoxicating liquor. The only witness who testified to the odor of liquor was the sheriff who received the defendant at the county jail some hours after he had done the cutting. He said that he detected the smell of liquor on his

breath at the time he was delivered to him and he was unable to engage him in conversation. The inference from his testimony is that the defendant appeared to be unable to converse rationally, or that he refused to talk at all. He left the matter in doubt. The viciousness of the assaults and the cruelty with which they were committed, standing alone, appear to be the inexplicable acts of a maniac or madman. But when weighed with the fact that the defendant must have been conscious that he was to face a felony accusation of a very serious character there appears to be "some method in his madness". The fact that he struck Soares, a heavy blow with the knife and accompanied it with the vile epithet, "Take that, you ——",and thereafter stated that he had cut the men "because they tried to arrest him without any reason, and he would do it again", is rather satisfactory evidence as to his consciousness as to what he was doing. The fact that he said to the constable at the time of his release after being investigated as to his possession of the cartons of cigarettes, "You are a square officer", also strengthens the conclusion that he had the ability to reason and appreciate the things which affected his personal interests.

The two experts who testified in the case expressed the unqualified opinion that the defendant knew the nature and the quality of the act with which he was charged and knew that it was wrong to commit it. Such is the legal test as to mental responsibility.

The claim of the defendant that he was not aware that the officers who had arrested him were in fact officers is dissipated by the circumstances of the case. He knew that he had attempted to commit a felony, and the law charged him with the knowledge that a private person may lawfully arrest another "when a felony has been committed and he has reasonable cause for believing the person arrested to have committed it". (Subd. 3, sec. 837, Pen. Code.) But aside from this provision of the code, there is good reason to believe that the defendant knew that Mr. Miner was an officer.

We have examined the instructions given and find them very complete and fair. The trial judge, with commendable care, stressed every phase of the law that was favorable to the defendant. The case was as well presented

by defendant's counsel as it was possible, in the light of the facts, to present it.

Judgment affirmed.

Thompson, J., Curtis, J., Langdon, J., Shenk, J., and Waste, C. J., concurred.